AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of California

**SEALED**

| FILED |
|---|
| **Nov 04, 2020** |
| CLERK, U.S. DISTRICT COURT |
| EASTERN DISTRICT OF CALIFORNIA |

United States of America
v.

GARRETT SCOTT WHEELEN
(date of birth XX/XX/1990)

_Defendant(s)_

)
)
)
)
)
)
)

Case No.     1:20-mj-0123-BAM

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___July 7, 2020 through August 17, 2020___ in the county of ___Fresno___ in the ___Eastern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1708 | Possession of Stolen Mail |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
_Complainant's signature_

Daniel Porter, U.S. Postal Inspector
United States Postal Inspection Service
_Printed name and title_

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim. P. 4.1 and 4(d).

Date: ___11/4/2020___

_____
_Judge's signature_

City and state:   ___Fresno, California___

Barbara A. McAuliffe, U.S. Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Daniel Porter, being duly sworn, depose and state the following:

### PURPOSE

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search and seize evidence, fruit, and/or instrumentalities of certain offenses as described in Attachment B, at the following locations, vehicles, and persons in the Eastern District of California, as more fully described in Attachment A-1 through A-4:

    a.      1019 N Peach Ave, Apt 161, Fresno, CA 93727, as further described in Attachment A-1;

    b.      2008 Black Mercedes Benz sedan with California license plate 8JSR985, VIN number WDBUF87X28B317312, as further described in Attachment A-2; (hereinafter, the "Premises");

    c.      GARRETT SCOTT WHEELEN (date of birth XX/XX/1990), as further described in Attachment A-3;

    d.      JURNEE RACINE PASSALIS (date of birth XX/XX/1995), as further described in Attachment A-4; (hereinafter, the "Subjects").

2.      I also make this affidavit in support of a criminal complaint and arrest warrant for GARRETT SCOTT WHEELEN (date of birth XX/XX/1990) for a violation of 18 U.S.C. § 1708 – Possession of Stolen Mail.

### INTRODUCTION AND AGENT BACKGROUND

3.      I am a Postal Inspector and have been so employed since February 2017. Currently, I am assigned to the San Francisco Division of the United States Postal Inspection Service (USPIS), and I work out of the Fresno office. During my tenure, I completed training at the United States Postal Inspection Service Academy in Potomac, MD. As a part of my official duties, it is my responsibility to investigate violations of federal and state law,

1

including robbery and burglary of postal facilities, destruction of government property, theft of U.S. Mail, possession of stolen U.S. Mail, mail and bank fraud, credit card fraud, identity theft, and counterfeit personal checks and identifications. As a U.S. Postal Inspector, I have participated in numerous criminal investigations relating to theft of U.S. Mail, counterfeit personal and corporate checks, possession of stolen U.S. Mail, credit application fraud, bank fraud, identity theft, counterfeit identifications, shipping of narcotics and firearms, and homicide.

4.   The facts and conclusions in this affidavit are based on my personal knowledge gained from my participation in this investigation, my training and experience, and information gained from other inspectors, agents, local law enforcement, and field contacts and reports. Since this affidavit is submitted for the limited purpose of obtaining search and arrest warrants, I have not included all of the facts of which I am aware in this investigation.

5.   Where statements made by other individuals are referenced in this Affidavit, such statements are described in sum and substance and in relevant parts only. Similarly, where information contained in reports and other documents or records is referenced in this Affidavit, such information is also described in sum and substance and in relevant parts only.

6.   Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that WHEELEN and PASSALIS have violated or aided and abetted violations of 18 U.S.C. § 371 – Conspiracy; § 1708 – Possession of Stolen U.S. Mail; § 2117 – Breaking or Entering Carrier Facilities; § 1028A – Identity Theft; § 1344 – Bank Fraud; § 1341 –Mail Fraud. Further, there is probable cause to believe that evidence, fruit, and/or instrumentalities of these violations are currently to be found at the locations in Attachments A-1 through A-4.

7.   The USPIS is investigating a criminal scheme that began at a time unknown to the United States but at least starting in or about August 2020, and is currently on-going, wherein the Subjects devised a material scheme to steal U.S. Mail and Personal Identifying

Information (PII) to defraud, and attempt to defraud, federally insured financial institutions and individuals. The Subjects executed and aided and abetted the scheme by obtaining, rifling, profiling, and altering identification and financial information from stolen U.S. Mail and from other stolen property containing identification and financial information. The Subjects catalogued, saved, and possessed the stolen mail and property. In processing the stolen mail and property, the Subjects targeted certain postal customers and mail receptacles utilized by those customers (postal victims). The Subjects further executed the scheme by forging stolen checks and using stolen credit cards or filing for California Employment Development Department (EDD) unemployment insurance benefits in the victims' names.

## STATEMENT OF PROBABLE CAUSE

### Overview and Ongoing U.S. Mail Truck Break-ins

8.     Over the past year, the USPIS has been informed of numerous break-ins to United States Postal Service ("USPS") vehicles in the Fresno, CA, area: approximately ten break-ins in 2020, and at least four having occurred since July 7, 2020. During these break-ins, the suspect(s) typically steal hundreds of pieces of U.S. Mail which often contain pieces of PII and/or credit/debit cards issued to the victims. These victims have subsequently reported that their credit/debit cards have been utilized at various merchants both online and or that their checks have been altered and fraudulently deposited to unauthorized accounts within the Fresno, CA area. The most recent USPS vehicle break-in occurred on August 17, 2020.

### Recent USPS mail truck break-ins and surveillance video recovered

9.     On August 11, 2020, at approximately 2:30 PM, a USPS mail truck was broken into in the vicinity of 452 E Harvard Ave, Fresno, CA 93704, and hundreds of pieces of incoming and outgoing mail was stolen from the vehicle.  The USPS letter carrier indicated that after he returned to his vehicle while on duty delivering mail, he noticed that the lock at the back of the mail truck had been punched out and the door was open.

10.     One witness in the area, R.O., who lived at 445 E Harvard Ave, Fresno, CA 93704, stated that he saw an unknown Caucasian male, with short brown hair, exit a tan "older model" sedan that was parked diagonally next to the rear of the USPS mail truck and facing southbound on N Wilson Ave.  R.O. indicated that he observed the unknown male open the trunk of the tan sedan and was lifting trays of mail and placing them into the back of the tan sedan.

11.     On August 17, 2020, Postal Inspector Sonia Perez was contacted by C.T., who resided at 445 E Brown Ave, Fresno, CA 93704.  C.T. stated that his/her neighbor R.O. had informed him/her about the USPS mail truck break-in and R.O. asked if he/she could check his/her security cameras.  Inspector Perez met with C.T. and recovered surveillance footage showing a vehicle, which matched the suspect vehicle as described by the witness R.O., circle the block and stage just north of the USPS mail truck moments prior to the break-in.

### Consent search of suspect vehicle identified in surveillance

12.     On September 4, 2020, I was contacted by Reedley Police Department Detective Cesar Cardenas in response to the USPIS BOLO.  Detective Cardenas indicated that a vehicle matching the suspect vehicle from BOLO was recently involved in a police pursuit that led to the subsequent arrest of an individual by the name of Garrett WHEELEN.  This pursuit was reported at Reedley Police Department (RPD) case number 20-0002577.

13.     In conversations with Detective Cardenas, officers from the scene, and from the RPD report, I learned that and RPD patrol unit observed a tan Mercedes-Benz sedan (license plate 6VEA562) and attempted to stop it for a violation of CVC 5201.1(c), driving with non-reflective license plates, and CVC 22450(a), failure to stop at the limit line of an intersection.  The tan Mercedes-Benz ran a red light and led officers on a 26-mile pursuit ending up in Sanger, CA, with approximate top speeds of 85-90 miles per hour during the chase and involving multiple patrol units and the deployment of road spikes to disable to the vehicle.

14.     After the tan Mercedes-Benz sedan was disabled, the driver, later identified as Garrett WHEELEN, fled the vehicle and led officers on a foot pursuit where he was later apprehended.  WHEELEN admitted that he was under the influence of methamphetamines and stated that he had purchased the Mercedes-Benz sedan a few weeks prior, but also admitted that he had some knowledge that the vehicle was stolen. WHEELEN was booked in on an active probation violation and taken into custody to the Fresno County Jail.

15.     Upon receiving knowledge of the incident involving the suspect vehicle matching the description of the BOLO, on September 4, 2020, I contacted Michael's Towing Company, located at 718 I Street, Reedley, CA 93654, which was still currently in possession of the suspect vehicle from the RPD pursuit.  Chris, the manager of the towing company provided me with access to the property so I could verify the suspect vehicle matched the tan Mercedes-Benz sedan from the BOLO.  My examination of the vehicle verified that it did in fact match the suspect vehicle from the August 11, 2020, USPS Mail Truck burglary.   I then inquired if the registered owner's information from the vehicle could be provided to me so I could get consent to search the vehicle for any evidence and or stolen mail.

16.     On September 4, 2020, I attempted to contact U.A., the registered owner of the Mercedes-Benz, VIN number WDBJF72F8NA534330.  U.A. was also contacted by RPD on August 31, 2020, and RPD indicated that although U.A. was the registered owner of the vehicle, U.A. was then working in Colorado, and his mother C.H. would be able to handle any affairs in regards to releasing the vehicle and or handling issues with law enforcement.

17.     On September 4, 2020, at approximately 11:30 AM, I was contacted by U.A. and C.H. on a 3-way phone call, and U.A. indicated that he/she would allow a consent search of the vehicle after I explained to him/her why I was interested in the vehicle.  I informed U.A., that his/her mother would be provided a consent to search form and multiple individuals would be present to which both agreed.

18.   U.A. confirmed that his Mercedes-Benz had been stolen a few months ago while he/she was playing basketball, and he/she had no knowledge of the vehicle's whereabouts until RPD had contacted him/her.  U.A. was asked if he knew or gave consent for WHEELEN to have possession or use his Mercedes-Benz, and U.A. stated he had no knowledge of WHEELEN and that he/she did not give consent.  U.A. had originally filed a stolen vehicle report with the Fresno Police Department (FPD) on July 13, 2020.  This was reported in FPD Report 20-038984.

19.   At approximately 12:20 PM, I conducted a consent search of the tan Mercedes-Benz, VIN number WDBJF72F8NA534330, with C.H., Postal Inspectors C. Morgan and S. Perez were also present.

20.   During the search of the tan Mercedes-Benz, which was documented with pictures, multiple stolen California State Driver's Licenses, credit cards, mail and stolen checks were recovered in the center console of the vehicle.  A closer examination of the checks indicated that some of the outgoing checks bared the same address range from the area involved in the August 11, 2020, USPS Mail Truck burglary involving the tan Mercedes-Benz vehicle.

### Intercepted Jail Calls

21.   Jail Calls intercepted between WHEELEN and his girlfriend Jurnee PASSALIS as recently as September 11, 2020, indicate that WHEELEN and PASSALIS are still in possession of PII and items that were possibly stolen from WHEELEN's involvement in the August 11, 2020 USPS mail truck break-in.  WHEELEN's identity on the phone calls is verified by his Jail ID number (JID), 7033304, the destination phone number he repeatedly calls, and by WHEELEN stating multiple times in the calls, "It's Garrett."

22.   In one call on September 3, 2020, WHEELEN asked his PASSALIS, "Did any of those other cards come through?"  WHEELEN's girfriend replied and stated that she needed to figure out how to create PIN code for the cards and WHEELEN replied, "You just need to get the last four of their social."  WHEELEN further stated, "[A.M.'s] social is on

there (his phone), on the text messages," and that, "whatever the name is, it's the first name, first letter of their last name at gmail.com."

23.    In another jail call on September 5, 2020, WHEELEN stated that an individual's login information for EDD, possibly the previously referenced, "[A.M.]" on the September 3, 2020 call, was "[victim name] 1869 at EDD" and "it's on the website."

24.    On a jail call on September 6, 2020, WHEELEN asked his girlfriend about activing the cards. WHEELEN's girlfriend stated that she was having a hard time finding that other information that was in the room. WHEELEN asked, "Her social? It was somewhere in that nightsand or in that one little box." WHEELEN went on to say that after his girlfriend activated the card to, "Put some money on my books with that once you get that going would be great." WHEELEN told his girlfriend that, "7033304 is my JID." WHEELEN asked his girlfriend about her upcoming new apartment and the conversation is how she was going to pay for it. The girlfriend replied, "Just pulling off enough money for the apartment for all they money they need."

25.    On a jail call on September 7, 2020, WHEELEN asked, "Did that card for [A.M.] go through?" WHEELEN's girlfriend replied that she could not get the password, to which WHEELEN replied, "Babe, all you gotta do is follow the directions on the card itself, log into the bank account, and put the name and email and the last four of his social, that's it." WHEELEN goes on to say, "You need to log onto Bank of America.com/activatemyfuckingcard and then go from there." WHEELEN then told his girlfriend, "You have his email address that I made right? That's all you need and the last four of his social. That's $20,000 right there." WHEELEN's girlfriend then said the victim information was on WHELLEN's phone but she also checked folders for information. WHEELEN stated, "It is in several different ones in a box for a car alarm or some shit." WHEELEN then got adjitated with his girlfriend and said, "You need to sign into [A.M.'s] account and get that money off of there. It's not hard. It's so fucking simple. Just follow the directions on the paperwork that the card is sent with. I need you to do that like soon because I need you to put money on my books."

26.     On a jail call on September 11, 2020, PASSALIS told WHEELEN that she just signed the lease for the new apartment.  She then told him that she bought WHEELEN a package for him while he was in jail.  WHEELEN then asked, "How many cards have you gotten so far?  Just the one for [A.M.] and somebody else?"  She replied that she found the information on a picture in WHEELEN's phone.  WHEELEN asked if she had activated the cards to which she responded no and that she didn't want to get locked out.  WHEELEN stated, "Just leave it, I'll figure it out on Monday when I get out."  PASSALIS stated she knew another one is coming, presumable an EDD card, and that in the past two days she had "gone down there" at 12 o'clock to check the mail.  WHEELEN then asked her, "Have you gotten the one for [L.H.] yet?"  PASSALIS responded, "yes."  WHEELEN then stated, "That's going to be the main one I think."  She then responded, "Yes, I got hers and [victim's], and I have another one coming."  WHEELEN then said, "If there is as much money on both of those cards as I think there will be, then we should have like $60,000."  She then stated that another card was coming in under the name "[victim name]."   WHEELEN replied excitely, "Oh man, I can't wait to get out of here.  We are gonna have brand new cards.  Sick ass cars too."

27.     During multiple conversations between WHEELEN and PASSALIS, PASSALIS indicated that she was moving to a new apartment around the area of Chestnut Ave.

**Surveillance at Fresno County Jail**

28.     On September 15, 2020, at approximately 4:30 PM, the Fresno County Jail was contacted to verify the release status of WHEELEN, (JID) Number 7033304.  A Fresno Sheriff's Office Deputy at the Fresno County Jail verified that WHEELEN was in the holding cell and was awaiting release.  The Deputy was asked to give Postal Inspectors time to get in place to surveil WHEELEN exiting the jail to which the Deputy complied.  The Deputy stated that WHEELEN was wearing a black shirt, has multiple tattoos on his arms and was also wearing a black sweatshirt.

29.     At approximately 4:38 PM that same day, Postal Inspectors parked outside of the Fresno County Jail located at 1225 M Street, Fresno, CA 93721.

30.      Approximately four minutes later, a male wearing a black sweatshirt, Inspectors
identified WHEELEN walking out of the front door of the Fresno County Jail and
hugging a female, identified as PASSALIS.

31.      At approximately 4:43 PM, both WHEELEN and PASSALIS got into a grey Acura
Sports Utility Vehicle (SUV) (license plate 4SEB777) and drove to Aladdin Bail Bonds
on 1342 Van Ness Ave, Fresno, CA 93721.  Both WHEELEN and PASSALIS were seen
entering Aladdin Bail Bonds and then returning to the Acura SUV.

32.      At approximately 5:03 PM, both WHEELEN and PASSALIS got back into the Acura
SUV and continued going westbound on Van Ness Avenue at a high rate of speed.  The
Inspectors followed the Acura going westbound over Divisidero Street, but lost the
vehicle on the Highway 41 /180 entrance ramp.

**WHEELEN and PASSALIS Activity at Premises to be Searched**

33.      On the morning of September 16, 2020, a search was conducted on the Law Enforcement
Archival Reporting Network (LEARN) for the possibility of a license plate reader hit of
the Acura SUV (4SEB777).  A return from the LEARN search indicated that on
September 15, 2020, at approximately 9:25 PM, the Acura SUV (4SEB777) was
observed parked in the area of 1019 N Peach Ave, Fresno, CA 93727.

34.      On September 16, 2020, at approximately 1:22 PM, Postal Inspectors Morgan and Perez
drove out to the area from the LEARN plate hit and observed the Acura SUV (4SEB777)
parked in parking spot number 97 in the area of 1019 N Peach Ave, Fresno, CA 93727.
Postal Inspectors Morgan and Perez then observed a U-Haul truck being backed up and
unloaded by a male identified as WHEELEN, a female identified as PASSALIS, along
with another unknown male.

35.      Postal Inspectors Morgan and Perez indicated that it appeared that household goods were
being unloaded from the U-Haul, but the location of the apartment was unknown.  They
further stated that they then walked around the apartment sidewalks for a better vantage
point and observed PASSALIS, WHEELEN, and the unknown male lifting items over the
railing of the back patio of an apartment. They also determined that the items being lifted

over belonged to Apt 161, in building 14, based on the location of the patio. They also
verified this information by signage on the exteriors of the building as well as the
apartment itself. After Postal Inspectors Morgan and Perez observed the offloading of
the U-Haul truck, they observed WHEELEN and the unknown male driving away in the
U-Haul, with PASSALIS following in the Acura SUV (4SEB777).

36.    On September 16, 2020, Postal Inspector Porter verified through U.S.P.S. databases that
PASSALIS submitted a change of address (COA) going to 1019 N Peach Ave, Apt 161,
Fresno, CA 93727, with a start date of September 14, 2020. Of note is that the mailing
address where PASSALIS was submitting the COA, was 19555 Lilac Ave, Reedley, CA,
93654, which through USPS databases, has also been associated with WHEELEN and
PASSALIS as recently as July 2020.

37.    On September 17, 2020, Postal Inspector Porter verified that the Acura SUV (4SEB777)
was still parked in parking spot 97 in the vicinity of 1019 N Peach Ave, Apt 161, Fresno,
CA 93727, and also noted that a blue Pontiac (license plate 8JSR985), with the registered
owner being WHEELEN, was parked two parking stalls next to the Acura SUV.

38.    On September 20, 2020, WHEELEN submitted a USPS interagency form to the USPS
letter carrier assigned to deliver mail to 1019 N Peach Ave, Apt 161, Fresno, CA 93727,
verifying that WHEELEN and PASSALIS are the current occupants at the residence and
the USPS letter carrier indicated that WHEELEN told him that, "other people may be
moving in."

39.    On September 21, 2020, WHEELEN's Probation Officer, Courtney DANELL, confirmed
that WHEELEN reported 1019 N Peach Ave, Apt 161, Fresno, CA 93727, as his address
of record and verified that this address is open to search under the terms of WHELLEN's
probation.

40.    On September 24, 2020, the blue Pontiac (8JSR985) registered to WHEELEN was not
seen in the area. However, a 2008 black Mercedes-Benz sedan, VIN number
WDBUF8X28B317312, was now bearing the license plate 8JSR985, and was parked in
the same spot the blue Pontiac was previously parked in. Accordingly, it appears

someone placed the license from WHEELAN's Pontiac on the black Mercedes.  The VIN number WDBUF8X28B317312 comes back to a registered owner in San Jose, CA, and not WHEELEN.  Also on September 24, 2020, a black and green Kawasaki Ninja motorcycle, plate number 22Z3970, was seen parked directly in front of the newly placed black 2008 Mercedes-Benz sedan.  The registered owner of the Kawasaki Ninja motorcycle has not been processed by the California Department of Motor Vehicle (DMV), as of October 5, 2020, but DMV records indicate that the Kawasaki Ninja motorcycle was sold on April 19, 2020 for $2,000.

41.    On October 22, 2020, Postal Inspectors were contacted by USPS maintenance who had replaced the locks on a vandalized cluster mailbox unit at the business address of 604 N Magnolia Ave, Clovis, CA.  I reviewed October 2020 video surveillance footage of the area near the vandalized cluster mailbox at that address.  The video timestamp of the footage shows 10/01/2020, but I believe this was an error in the system because the USPS letter carrier and maintenance reports indicate that this break-in was reported on 10/21/2020.  The footage showed a white male, whom I identified as WHEELEN based on my recent observations and surveillance of him, take a power drill between his vehicle and an area a few feet away from the cluster mailbox.  I inspected the damaged mailbox unit and photos of the same and determined that the locks appeared to have been broken and breached with a drill.  In fact, the doors of the unit had been left open after the incident.  In the surveillance video, I also observed the vehicle (snapshot below) that the suspect was driving and believe it is the same Mercedes Benz (8JSR985) that I observed parked at 1019 N Peach Ave, near the area of WHEELEN and PASSALIS's current residence.



Based on my training and experience, I know that mail thieves often leave fruits and instrumentalities of their mail-theft crimes in their vehicles—including, for example, stolen mail, counterfeit mail keys, and burglary tools.

### California EDD UI Program

42.   The California EDD Unemployment Insurance (UI) Program offers financial benefits to individuals who lost employment through no fault of their own, are able to, available for, and actively seeking work as instructed by the EDD.  Many recent EDD UI claims are due to the COVID-19 pandemic.  To qualify for EDD UI benefits, individual(s) must have been employed or actively looking for work when they file.  EDD financial benefits are calculated for each individual based on wages earned in the timeframe as listed in the EDD UI claim guidelines.

43.   An individual may apply for EDD UI benefits by either submitting a claim in-person at any EDD field office, by mail, or online through EDD's website.

44.   EDD UI benefits are paid bi-weekly.  Generaly, claimaints receive VISA debit cards through Bank of America and their benefits are deposited theron.  Claimaints may also elect to receive their benfits via check.  Both debit cards and checks are mailed to the claimants.

45.   EDD has an agreement with Bank of America wherby the bank will provide EDD's Investigations Division with account holder information and transaction history, and surveillance footage for cash withdrawals going back 120 days, for clamants who received debit cards.

46.     According to postal records, WHEELEN and PASSALIS have received mail in their names at the address of 1019 N Peach Ave, Apt 161, in Fresno, California. Records also indicate, as recent as October 26, 2020, that the same address has received mail addressed to names other than WHEELEN and PASSALIS, including financial mail and mail from the EDD, which manages unemployment claims for the State of California.

47.     Based upon my training and experience in mail theft investigations, I know that suspects often take the U.S. Mail that they obtained illegally to their residences and vehicles so they can open and examine it in private. For example, suspects often keep stolen mail and its contents in their vehicles where items – such as stolen bank cards, checks, and means of identification – are accessible when the suspects travel to destinations where such items may be used for fraud.  I also know that these same suspects often store the contents of stolen U.S. Mail at their residences, and especially in their bedrooms and offices, until they are ready to use it.

### Detailed Information provided by EDD Investigations

48.     On September 29, 2020, EDD Investigations returned information as requested by the USPIS regarding the names and Social Security numbers for WHEELEN, PASSALIS, and victims L.H. and A.M.

49.     As of September 29, 2020, a review of EDD UI payments going to L.H. indicate that approximately four payments of $405.00, totaling $1620.00, were sent to L.H.  On September 30, 2020, Inspector Porter telephonically interviewed victim L.H.  He/she is a school teacher and verified that his/her work had contacted him/her about someone applying for EDD benefits under his/her name.  He/she further indicated that he/she did not know WHEELEN or PASSALIS, and had not received any money from the EDD UI program.

50.     As of September 29, 2020, a review of EDD UI payments going to A.M. indicated that approximately thirty payments of $405.00, totaling $12,150.00, were sent to A.M.  On October 5, 2020, Inspector Porter telephonically interviewed A.M.  He/she verified that although he/she knows WHEELEN and had originally asked WHEELEN to assist

him/her in applying for EDD UI payments, he/she not received any money and all communications with WHEELEN had ceased.

51. The EDD application information provided indicated that the same, and new mailing address for PASSALIS, L.H., and A.M. was registered on September 17, 2020, for continued benefits and verification.  The new PO Box address belonged to a Commercial Mail Receiving Agency (CMRA), Postal Express, located at 711 W Shaw Ave. Ste. 112, Clovis, CA 93612.

52. On September 29, 2020, a PO Box application was provided by Postal Express and indicated that 711 W Shaw Ave. Ste. 112, PMB 11, Clovis, CA 93612, was paid for and registered to PASSALIS on September 16, 2020.  The address of record listed on the PO Box application for PMB 11 was listed as 1019 N Peach Ave, Fresno, CA, 93727.

53. On October 1, 2020, an inbound package was observed addressed for 711 W Shaw Ave. Ste. 112, PMB 11, Clovis, CA 93612, under the name Garrett WHEELEN.  A conversation with the manager of Postal Express indicated that WHEELEN regularly picked up mail for PMB 11 at the store.  Of further interest of the package observed on October 1, 2020, was that a search of the sender on the return address listed the package as being sent from a company that sells automotive lock-picking tools.

54. On October 3, 2020, two in-bound First Class EDD letters addressed to L.H. and PASSALIS were observed addressed to 711 W Shaw Ave. Ste. 112, Clovis, CA 93612.

55. On October 5, 2020, two in-bound First Class EDD letters addressed to a PASSALIS and A.M. were observed addressed to 711 W Shaw Ave. Ste. 112, Clovis, CA 93612.

**Use of Electronic Devices for Criminal Activity and Forensic Analysis**

56. Based on the above-described evidence, there is probable cause to believe that the Subjects used electronic devices—such as smart phones, cell phones, tablets, and computers as instrumentalities of their scheme and used the devices to store evidence and fruits of their crimes.

57.    As described above, many of the fraudulent access devices were registered via the internet, and, in some instances, a phone number or email address was provided. These actions typically require the use of electronic devices.

58.    Based upon my training and experience, and my discussions with other law enforcement personnel, I am aware that it is common for perpetrators of mail theft, fraud and identity theft to use electronic devices to obtain information for the execution of their scheme or to disseminate scheme information to other individuals. I am also aware that the perpetrators of this scheme may reside and/or have committed these offenses within different cities and counties and may rely on mobile and electronic forms of communication with each other regarding their fraudulent activities.

59.    Based upon my training and experience, my conversations with other law enforcement personnel assisting in this case, and my investigation in this case, I am aware that persons involved in identity theft, mail theft, credit card fraud, and bank fraud, along with their conspirators/accomplices use smart phones, cell phones, tablets, and computer laptops to communicate with one another, either by voice calls, emails, or text messages regarding their fraud and theft activities. I know that perpetrators who use such devices commonly exchange real time information about theft and fraud activity and other information regarding execution of theft or fraudulent transactions. Such information can be found stored in the text/email messages and images on such devices. Such persons also use the devices to link with the internet to obtain addresses and maps and locations/addresses of victims, including but not limited to merchants, banks, and individual identity theft victims. Such devices can also be used to: remotely make online fraudulent purchases, perform false or fraudulent mobile banking operations and checks (verifications), and distribute the proceeds of fraudulent activities to co-conspirators via banking and money-transfer applications.

60.    Based upon my training and experience, my conversations with other law enforcement personnel assisting in this case, and my investigation in this case, I am aware that the complete contents of text messages, image files, and emails may be important to

establishing the actual user who has dominion and control of a particular phone or computer at a given time. Cell phones may be subscribed to under false names with little to no verification by the service provider. Cell phones and computers may also be used by multiple people. Given the ease with which such items may be obtained and used, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of a particular cell phone or device that was used to send a particular text or email message, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular cell phone or device. Often, by piecing together information contained in the contents of the device (cell phone or computer or storage device) an investigator can establish the identity of the actual user. Often, those pieces will come from a time period before the device was used in criminal activity. Limiting the scope of the search for information showing the actual user of the device would, in some instances, prevent the government from identifying the user of the device and, in other instances, allow a defendant to possibly suggest that someone else was responsible. Therefore, the entire content of a communication device often provides important evidence regarding the actual user's dominion and control of the device. Moreover, review of the contents of communications of electronic storage devices, including text and email messages sent or received by the subject device assist in determining whether other individuals had access to the device.

61.   Based upon my training and experience, my conversations with other law enforcement personnel assisting in this case, and my investigation in this case, I am aware that criminals discussing their criminal activity via electronic communication devices (email and text messaging) may use images, slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or code words (which require entire strings or series of text message conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. It is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a text

message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and paren :) to convey a smile or agreement) to discuss matters. "Keyword searches" or other automated methods of review of the text messages sent to and from the subject device would not account for any of these possibilities, so actual review of the text and email messages by law enforcement personnel with information regarding the identified criminal activity is necessary to find all relevant evidence.

62.     Based upon my training and experience, my conversations with other law enforcement personnel assisting in this case, and my investigation in this case, I have learned the following additional information:

    a.     Individuals who steal, misdirect, take, unlawfully possess, or by fraud or deception obtain, U.S. Mail often maintain the U.S. Mail, and its contents – including access devices, bankcards, and gift cards – for long periods of time to exceed months. Such individuals will also scan onto computers, cell phones, and computer storage devices stolen mail or fraudulently obtained mail (and its contents) and maintain on computers, cell phones, and storage devices co-conspirators names, victim's names, addresses (of victims, associates, accomplices), and stolen means of identification, to include images of such, thereby reducing such items' exposure to law enforcement and the community. Individuals use their cell phones and personal computers to make online purchases using gift cards to order items that will be shipped to their residences.

    b.     I am aware that even if a perpetrator deletes evidence of criminal activity (such as identity theft, and fraudulent use of financial information in U.S. Mail) from electronic storage devices, the evidence often can be recovered from the devices, including computers or other forms of electronic storage media.

63.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

64.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on an electronic device's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic devices and storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

65.     There is probable cause to believe that things that were once stored on any electronic devices located at any of the PREMISES may still be stored there, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system

configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

66.    Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how electronic devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the electronic devices found because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.      I know that when an individual uses an electronic device, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

67.    Necessity of seizing or copying entire computers or storage media. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes

possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.      The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

68.    Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of electronic devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a device to human inspection in order to determine whether it is evidence described by the warrant.

69.    Manner of execution.  Because this portion of the warrant—seeking forensic examination of electronic devices found—seeks only permission to examine device(s) that would be already in law enforcement's possession, the execution of the forensic examination would not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of such examination at any time in the day or night following the seizure of the device.

70.    Because several people share the addresses listed in Attachment A-1 as a residence, it is possible that the locations will contain electronic devices and storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is probable that the things described in this warrant could be found on any of those devices or storage media, the warrant applied for would permit the seizure and review of those items as well.

**Comparability with Prior Investigations and Experience**

71.    Based on my review of the records and documents in this case, my training and experience, and my discussions with other law enforcement personnel in this investigation, I do not believe contact between any law enforcement and the individuals perpetrating this scheme will necessarily result in them destroying or moving all evidence, fruits, or instrumentalities of the crimes. I am aware that even after contact with law enforcement, individuals involved in schemes to defraud, and attempts to defraud, federally insured financial institutions will not always cease criminal conduct. To the contrary, such individuals often are emboldened, believing they are no longer targets or suspects. I am aware that often such individuals immediately return to obtaining, and

altering fraudulently obtained identification and financial information. In addition, individuals retrieve secreted catalogues, saved and profiled contents of fraudulently obtained financial information and property from areas law enforcement did not search or seize. The individuals will then maintain the items in close proximity, including in their residence. Also, the individuals will—after initial discovery by law enforcement—return to obtaining further identification and financial information (including replacement access devices and PIN numbers for replacement credit/debit cards). Of course, I am also aware based on my training and experience that individuals in schemes such as this one, who have not been confronted by law enforcement, also continue their participation in the criminal conduct.

72.    Also, based on my training and experience, and my discussions with other law enforcement personnel, I am aware that following contact with law enforcement, individuals involved in schemes to defraud, and attempts to defraud federally insured financial institutions will occasionally change vehicles in order to continue criminal conduct, including fraud.

73.    I am aware that individuals involved in bank fraud, credit card fraud, aggravated identity theft, possession of stolen U.S. Mail, and theft of U.S. Mail, and conspiracy to commit such offenses (including schemes to acquire and to use federally insured bank credit cards assigned to others), obtain access devices, PIN numbers, financial information, identity information, checks and other personal and financial information of victims via stolen U.S. Mail and other thefts. Such individuals, working together, often maintain close contact and travel together. I am aware that in mail theft, bank fraud, mail fraud, and identity theft schemes, perpetrators often use victim names and pose as victims online to make internet transactions, to open accounts, and to cause fraudulently purchased items to be mailed in the victims' names. After contact with law enforcement, mailings and parcels in furtherance of access device fraud, identity theft, bank and other fraud schemes continue to be received by perpetrators, including the name(s) of other and victims. Perpetrators receive mailings and parcels in other names to avoid detection and

to create a layer of anonymity by, for example, continuing to change the identities being used. Also to avoid detection, perpetrators will cause fraudulently purchased items to be mailed and stored at different locations. I am aware that perpetrators will keep tools, implements, financial statements, access devices, and stolen items close to themselves (especially in vehicles they use, or their person, in their residences, in the residences of extended family members, and in storage units) or in areas to which they have access in order to ensure custody and control of the items and for easy access for use or disposal.

## CONCLUSION

74.    For the reasons stated above, there is probable cause to believe that Garrett WHEELEN committed the offense of Possession of Stolen Mail, in violation of 18 U.S.C. § 1708, on or about August 11, 2020.

75.    For the reasons stated above, there is also probable cause to believe that evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. § 371 – Conspiracy; § 1708 – Possession of Stolen U.S. Mail; § 2117 – Breaking or Entering Carrier Facilities; § 1028A – Identity Theft; § 1344 – Bank Fraud; § 1341 –Mail Fraud, as more fully described in Attachment B, hereby fully incorporated herein, may be found at the Premises or on the Subjects identified in Attachments A-1 through A-4, attached and fully incorporated herein.

**[CONTINUED ON NEXT PAGE]**

### REQUEST TO SEAL

76.     This case is the product of a covert investigation.  Based on my training and experience in investigations such as this one, I believe that public disclosure of the existence of this affidavit, complaint, arrest warrants and/or search warrants may have a significant and negative impact on the continuing investigation and may severely jeopardize law enforcement efforts to execute the warrants.  Also, premature disclosure may pose a risk to executing law enforcement.  It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this affidavit, the accompanying search warrant, and application.

_____
Daniel Porter
U.S. Postal Inspector
United States Postal Inspection Service


Approved as to form.


_____
Robert J. Artuz
Special Assistant U.S. Attorney


Affidavit submitted by email/pdf and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1, 4(d), and 41(d)(3) before me on this ____4____ day of November, 2020.


_____
THE HONORABLE BARBARA A. McAULIFFE
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

The place to be searched: 1019 N Peach Ave, Apt 161, Fresno, CA 93727, including the garage and all storage sheds and containers at or associated with the residence and residence yard.  The residence is shown in the photographs below and is further described as follows: 1019 N Peach Ave, Apt 161 is a grey, single level apartment, with a dark shingled roof, dark grey trim around the windows with white shutters on the inside of the windows, a red or maroon door with white trim located in a receded entrance to the left of another door with brown trim around it, and the numbers "161" are affixed in black placarded on the front of the apartment.

 

This warrant authorizes the on- or off-site forensic examination of only electronic devices found in the possession of or determined to be under the control of either Garrett Scott WHEELEN or Jurnee Racine PASSALI, for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-2**

The place to be searched is a 2008 Black Mercedes Benz sedan, with California license plate 8JSR985 registered to Garrett WHEELEN, which is depicted parked in driveway of vicinity of 1019 N Peach Ave, Apt 161, Fresno, CA 93727, in the below photograph:



This warrant authorizes the on- or off-site forensic examination of only electronic devices found in the possession of or determined to be under the control of either Garrett Scott WHEELEN or Jurnee Racine PASSALI, for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-3**
*Person to be searched*

The person to be searched is Garrett Scott WHEELEN.  WHEELEN is a white male, approximately 5'9", with brown hair and blue eyes. WHEELEN's date of birth is XX/XX/1990. WHEELEN's photograph appears below.



The search of WHEELEN shall include his person, clothing, and personal belongings, including backpacks, briefcases and bags, that are within the immediate vicinity and control at the location where the search warrant is executed and that may contain the items called for by Attachment B to this warrant. This warrant authorizes the on- or off-site forensic examination of only electronic devices found in the possession of or determined to be under the control of either Garrett Scott WHEELEN or Jurnee Racine PASSALI, for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-4**
*Person to be searched*

The person to be searched is Jurnee Racine PASSALIS. PASSALIS is a white female, approximately 5'3", with brown hair and brown eyes. PASSALIS's date of birth is XX/XX/1995. PASSALIS's photograph appears below.



The search of PASSALIS shall include her person, clothing, and personal belongings, including backpacks, briefcases and bags, that are within the immediate vicinity and control at the location where the search warrant is executed and that may contain the items called for by Attachment B to this warrant. This warrant authorizes the on- or off-site forensic examination of only electronic devices found in the possession of or determined to be under the control of either Garrett Scott WHEELEN or Jurnee Racine PASSALI, for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

The evidence to be searched for and seized concerns violations of Title 18, United States Code, Sections 371 (conspiracy), 2117 (breaking into a carrier facility), 1708 (possession of stolen U.S. Mail), 1028A (aggravated identity theft), 1344 (bank fraud), 1341 (mail fraud) whether physical, digital, electronic, or otherwise, occurring after August 1, 2020, and is described in the enumerated list below:

1.      Items and information tending to identify persons exercising dominion and control over the location or particular areas within the location, including correspondence, papers, photos, videos, bank statements, credit card statements, receipts, utility bills, emails, internet transaction records, parcels, mail, and clothing;

2.      United States mail, identification documents, and access devices bearing the names of, or otherwise tending to pertain to, persons who do not live at or control the location;

3.      Documents, records, and information relating to the contents of mail or property in the names of persons who do not live a or control the location, together with indicia of possession, control, ownership or use of such mail or property;

4.      Documents, records, and information tending to show how money associated with the theft or possession of U.S. Mail was obtained, secreted, transferred, and/or spent, including online purchases and electronic transfer of funds;

5.      U.S. Currency over $5,000;

6.      Documents, records, and information containing, referencing, or listing the following types of personally identifying information for individuals, businesses or merchants: names, dates of birth, Social Security Numbers, email addresses, telephone numbers, passwords, bank account numbers, credit card numbers, charge card numbers, credit card images, PIN numbers;

7.      Credit cards, debit cards, gift cards and documents, records, and information pertaining to the possession, control, ownership, or use of credit cards, debit cards, gift cards, including items obtained through transactions involving credit cards, debit cards, and gift cards;

8.      Financial instruments, documents, and information for all cards and/or accounts in the names of suspected victims and other persons who do not live at 1019 N Peach Ave, Apt 161, Fresno, CA 93727, including the following: credit applications, account applications, account numbers, credit cards, charge cards, store specific account cards, prepaid debit cards, business and personal checks, receipts, account statements, account related correspondence, records of goods and services obtained, electronic books, money drafts,

letters of credit, money orders, cashier's checks and receipts, deposits and withdrawal slips, and passbooks;

9.      Documents, records, and information pertaining to unemployment benefits (whether or not attempted or successfully) for names other than Garrett WHEELEN and Jurnee PASSALIS;

10.     All bank records, checks, credit card bills, account information, and other financial records;

11.     Documents, records and information constituting, discussing, establishing or tending to constitute, discuss or establish: (a) fraudulent or unauthorized activity involving personally identifying information, and (b) the theft and trafficking of personally identifying information;

12.     Tools and materials usable to make identification documents, check, or financial documents, including: templates and software for making identifications, checks, or credit cards; laminating machines, printers, electronic reader writers, label makers, heat sealers, embossers, and identification imprinters, and access devices; and check washing materials, paper stock, chemicals such as acetone to remove ink, and magnetic ink;

13.     Records and information relating to the internet service provider and Internet Protocol address assigned to the premises;

14.     Evidence that may identify any coconspirators, coschemers, or aiders and abettors, including records that help reveal their whereabouts;

15.     Communications between coconspirators, coschemers, and aiders and abettors;

16.     Photographs, images, and communications regarding any information responsive to any of the above Paragraphs; and

17.     With respect to "digital devices," in addition to all of the categories described in the preceding Paragraphs, items and information to be seized include any electronic records, including e-mail messages, text messages, videos, electronic documents, images, and/or data:

     a.   tending to identify persons exercising dominion and control over each digital device searched; and

     b.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of any electronic information responsive to any of the above Paragraphs.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

The terms "digital devices" and "electronic devices" mean computers, computer tablets (e.g., iPads), electronic storage devices (e.g., hard drives, thumb drives), smart phones, mobile phones, cellular phones, and POS terminals. The seizure and search of digital devices shall follow the procedures outlined in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the digital devices may be searched for the evidence above.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

The term "IP address" or "Internet Protocol address" means a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

The term "Internet" means a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.